No. 25-1300

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

Christopher Kohls; Mary Franson,

Plaintiffs-Appellants,

vs.

Keith M. Ellison, in his official capacity as Minnesota Attorney General;
Chad Larson, in his official capacity as Douglas County Attorney,

Defendants-Appellees.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
_____

APPELLEE ELLISON'S BRIEF
_____

KEITH ELLISON
Attorney General
State of Minnesota

LIZ KRAMER
Solicitor General
PETER J. FARRELL
Deputy Solicitor General
ANGELA BEHRENS
ALLEN COOK BARR
Assistant Attorneys General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 757-1424

STATES UNITED DEMOCRACY
CENTER

JUDY M. SHIH
MAX JORDAN KOBER
1101 17th St NW, Suite 250
Washington, DC 20036
(202) 999-9305

*Attorneys for Appellee Ellison*

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

This case is a pre-enforcement facial challenge to a Minnesota law that prohibits objectively misleading AI-generated deepfakes that threaten free and fair elections. The law was enacted with broad, bipartisan support in 2023, and then refined in 2024.

Appellant Christopher Kohls is a content creator who posts AI-generated parodies about politics on social media. Appellant Mary Franson is a state legislator who voted for the challenged deepfake law in 2023 and later reposted one of Kohls' parodies. Kohls and Franson claim that Minnesota's law infringes their First and Fourteenth Amendment rights. They sued Appellees, the Minnesota Attorney General and the Douglas County Attorney, and then moved for a preliminary injunction.

The district court denied the injunction. The court concluded that Kohls lacked standing. It also concluded that Franson failed to show irreparable harm because she waited 16 months to challenge the law that she voted for.

The Attorney General requests 20 minutes for oral argument.

i

# TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF AUTHORITIES ...............................................................................v

ISSUES .........................................................................................................1

INTRODUCTION .............................................................................................2

STATEMENT OF THE CASE.............................................................................3

I.  Minnesota Seeks to Combat Deceptive Deepfakes in the Leadup
    to Elections.............................................................................................3

    A.  Deepfakes Pose a Serious Threat to Free and Fair Elections...............3

    B.  Minnesota Prohibits Deceptive Deepfakes Before Elections. ...............4

II. Kohls and Franson Bring a Belated Pre-Enforcement
    Challenge. ...............................................................................................6

SUMMARY OF ARGUMENT .............................................................................7

ARGUMENT ..................................................................................................9

I.  Kohls and Franson Lacked Standing to Seek Injunctive Relief. .........9

    A.  Kohls and Franson Did Not Show First Amendment Injury. .............10

        1.  The deepfake law does not apply to parody. ...........................11

        2.  Kohls' and Franson's contrary statutory arguments lack
            merit. ..................................................................................13

        3.  The deepfake law does not arguably proscribe Kohls' or
            Franson's conduct. ................................................................16

ii

    i.  Because Kohls posts only obvious parodies, his speech is not arguably proscribed...................................16

    ii.  Because Franson posts only obvious parodies, her speech is not arguably proscribed...................................19

   4.  Kohls and Franson did not show a credible threat of enforcement..................................................................21

  B.  Kohls' New "Resharing" Theory of Injury Fails Too.........................23

  C.  If the Court Has Doubts, It Should Certify the Parody Question to the Minnesota Supreme Court.........................................25

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT FRANSON FAILED TO SHOW IRREPARABLE HARM.................................27

  A.  The District Court Did Not Abuse Its Discretion in Concluding That Franson's Delay Precludes a Finding of Irreparable Harm. .......28

  B.  The District Court Did Not Abuse Its Discretion in Concluding That Franson's Injury Is Self-Inflicted.................................33

III. KOHLS AND FRANSON ARE UNLIKELY TO PREVAIL ON THE MERITS THAT THE DEEPFAKE LAW IS FACIALLY UNCONSTITUTIONAL. .................................35

  A.  If the Court Reaches Likelihood of Success, It Should Remand.........35

  B.  If the Court Declines to Remand, Kohls and Franson are Unlikely to Succeed..........................................................36

   1.  The deepfake law contains important limitations on its scope..............................................................37

   2.  The First Amendment does not protect the false speech that the deepfake law prohibits. .................................38

    i.  Deepfakes are false speech that cause legally cognizable harm...........................................39

Appellate Case: 25-1300  Page: 4  Date Filed: 05/19/2025 Entry ID: 5517985

ii.    Deepfakes are false speech made to accomplish a
       fraud. .................................................................40

3.    Even if the law reaches some speech protected by the First
      Amendment, it is still constitutional. ........................................41

      i.    Intermediate scrutiny should apply to the deepfake
            law..................................................................41

      ii.    Even if strict scrutiny applies, the electoral deepfake
             statute passes it. .............................................43

4.    The deepfake law does not discriminate based on
      viewpoint..................................................................50

CONCLUSION ........................................................................52

Appellate Case: 25-1300    Page: 5    Date Filed: 05/19/2025 Entry ID: 5517985

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*281 Care Comm. v. Arneson*,
   638 F.3d 621 (8th Cir. 2011)................................................................. 30

*281 Care Comm. v. Arneson*,
   766 F.3d 774 (8th Cir. 2014).......................................... 31, 43, 47, 49

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
   112 F.4th 507 (8th Cir. 2024) .......................................................... 36

*Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   17 F.4th 793 (8th Cir. 2021) ............................................................. 28

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)............................................................................. 26

*Animal Legal Def. Fund v. Reynolds*,
   8 F.4th 781 (8th Cir. 2021) ............................................................... 39

*Arizonans for Official English v. Arizona*,
   520 U.S. 43 (1997)............................................................................... 26

*Benisek v. Lamone*,
   585 U.S. 155 (2018) ..................................................................... 28, 32

*Bennett v. Isagenix Int'l LLC*,
   118 F.4th 1120 (9th Cir. 2024) ........................................................ 34

*Blue Moon Ent., LLC v. City of Bates*,
   441 F.3d 561 (8th Cir. 2006)............................................................. 36

*Brockett v. Spokane Arcades, Inc.*,
   472 U.S. 491 (1985)............................................................................. 26

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011)............................................................................. 44

Appellate Case: 25-1300     Page: 6     Date Filed: 05/19/2025 Entry ID: 5517985

*Burson v. Freeman*,
  504 U.S. 191 (1992) ........................................................................ 43

*California v. Texas*,
  593 U.S. 659 (2021) ........................................................................ 21

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
  68 F.3d 828 (3d Cir. 1995) ............................................................ 34

*Carpenters' Pension Fund of Ill. v. Neidorff*,
  30 F.4th 777 (8th Cir. 2022) ......................................................... 40

*Chaplinsky v. New Hampshire*,
  315 U.S. 568 (1942) ........................................................................ 38

*Christian Action League of Minn. v. Freeman*,
  31 F.4th 1068 (8th Cir. 2022) .................................................. *passim*

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 417 (2013) ........................................................................ 24

*Const. Party of S.D. v. Nelson*,
  639 F.3d 417 (8th Cir. 2011) ........................................................... 9

*Corner Post, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*,
  603 U.S. 799 (2024) ........................................................................ 30

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ........................................................ 27

*Davis v. FEC*,
  554 U.S. 724 (2008) ........................................................................ 45

*Do No Harm v. Pfizer, Inc.*,
  126 F.4th 109 (2d Cir. 2025) ........................................................ 18

*Doe v. Bell*,
  969 F.3d 883 (8th Cir. 2020) ........................................................ 44

vi

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985) ........................................................................ 39, 49

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................ 32

*Florida v. Dep't of Health & Hum. Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ............................................................... 34

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................................ 10

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015).................................................................... 28

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ................................................................................ 39

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
    114 F.4th 660 (8th Cir. 2024) ................................................................. 37

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*,
    415 U.S. 423 (1974) ................................................................................ 37

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) ............................................................... 29

*Hershey v. Jasinski*,
    86 F.4th 1224 (8th Cir. 2024) ................................................................. 30

*Hirschfeld v. Board of Elections*,
    984 F.2d 35 (2d Cir. 1993)....................................................................... 34

*Home Instead, Inc. v. Florance*,
    721 F.3d 494 (8th Cir. 2013)................................................................ 1, 36

*Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*,
    115 F.4th 889 (8th Cir. 2024) ........................................... 1, 28, 30, 32

vii

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*,
  903 F.3d 278 (3d Cir. 2018).................................................................... 25

*Indiana Right to Life v. Morales*,
  66 F.4th 625 (7th Cir. 2023) ............................................................... 26

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ............................................................. 18

*Kirkeby v. Furness*,
  52 F.3d 772 (8th Cir. 1995).................................................................. 32

*United States v. Iowa*,
  126 F.4th 1334 (8th Cir. 2025) ........................................................... 18

*L.H. v. Indep. Sch. Dist.*,
  111 F.4th 886 (8th Cir. 2024) ................................................... 9, 10, 22

*Lankford v. Sherman*,
  451 F.3d 496 (8th Cir. 2006)................................................................ 36

*McKesson v. Doe*,
  592 U.S. 1 (2020) ................................................................... 11, 26, 27

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ................................................................................ 12

*Missouri v. Yellen*,
  39 F.4th 1063 (8th Cir. 2022) .................................................. 1, 17, 22

*Mo. Roundtable for Life v. Carnahan*,
  676 F.3d 665 (8th Cir. 2012)................................................................ 25

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ................................................................. *passim*

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................... 18, 19, 24

Appellate Case: 25-1300     Page: 9     Date Filed: 05/19/2025 Entry ID: 5517985

*Nat'l Coal. on Black Civic Participation v. Wohl*,
  661 F. Supp. 3d 78 (S.D.N.Y. 2023) ..................................................... 42

*Ng v. Bd. of Regents of Univ. of Minn.*,
  64 F.4th 992 (8th Cir. 2023) .............................................................. 28

*Nord v. Walsh Cnty.*,
  757 F.3d 734 (8th Cir. 2014) ............................................................. 42

*Padda v. Becerra*,
  37 F.4th 1376 (8th Cir. 2022) ............................................................ 27

*Parents Defending Educ. v. Linn Marr Cmty. Sch. Dist.*,
  83 F.4th 658 (8th Cir. 2023) .............................................................. 23

*Perry v. Precythe*,
  121 F.4th 711 (8th Cir. 2024) ............................................................ 29

*Phelps-Roper v. City of Manchester*,
  697 F.3d 678 (8th Cir. 2012) .............................................................. 32

*Phelps-Roper v. Nixon*,
  545 F.3d 685 (8th Cir. 2008) .............................................................. 31

*Publ'g Co. v. AT & T Corp.*,
  320 F.3d 1081 (10th Cir. 2003) .......................................................... 34

*Ramirez v. Collier*,
  595 U.S. 411 (2022) ......................................................................... 47

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ......................................................................... 40

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) ............................................................ 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ......................................................................... 50

Appellate Case: 25-1300   Page: 10   Date Filed: 05/19/2025 Entry ID: 5517985

*S.F. Real Est. Invs. v. Real Est. Inv. Tr. of Am.*,
  692 F.2d 814 (1st Cir. 1982) ................................................................ 34

*Sch. of the Ozarks, Inc. v. Biden*,
  41 F.4th 992 (8th Cir. 2022) ....................................................... 1, 22, 25

*SEC v. Das*,
  723 F.3d 943 (8th Cir. 2013) ................................................................ 40

*Second City Music, Inc. v. City of Chicago*,
  333 F.3d 846 (7th Cir. 2003) ................................................................ 34

*Sleep No. Corp. v. Young*,
  33 F.4th 1012 (8th Cir. 2022) ............................................................... 23

*Soltysik v. Padilla*,
  910 F.3d 438 (9th Cir. 2018) ................................................................ 40

*Speech First, Inc. v. Killeen*,
  968 F.3d 628 (7th Cir. 2020) ................................................................ 18

*St. Paul Chamber of Com. v. Gaertner*,
  439 F.3d 481 (8th Cir. 2006) ................................................................ 31

*Straights & Gays for Equal. (SAGE) v. Osseo Area*,
  471 F.3d 908 (8th Cir. 2006) ................................................................ 32

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................. 10

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ................................................................. 34

*United States v. Alvarez*,
  567 U.S. 709 (2012) ..................................................................... 1, 40, 42

*United States v. Lepowitch*,
  318 U.S. 702 (1943) ............................................................................. 41

x

*United States v. Mackey*,
   652 F. Supp. 3d 309 (E.D.N.Y. 2023) ................................................ 42

*United States v. Nissen*,
   666 F.3d 486 (8th Cir. 2012) ......................................................... 19

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................. 12

*Virden v. City of Austin*,
   127 F.4th 960 (5th Cir. 2025) ....................................................... 30

*Warmington v. Bd. of Regents of Univ. of Minn.*,
   998 F.3d 789 (8th Cir. 2021) ......................................................... 19

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ................................................................. 43

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................... 27

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ...................................................... 31

**State Cases**

*In re Civil Commitment of Benson*,
   12 N.W.3d 711 (Minn. 2024) ......................................................... 11

*In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*,
   624 N.W.2d 264 (Minn. 2001) ........................................................ 47

*Leindecker v. Asian Women United of Minn.*,
   848 N.W.2d 224 (Minn. 2014) ........................................................ 48

*State v. Mauer*,
   741 N.W.2d 107 (Minn. 2007) ..................................................... 12, 13

Appellate Case: 25-1300   Page: 12   Date Filed: 05/19/2025 Entry ID: 5517985

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................ *passim*

U.S. Const. art. III ................................................................................ 9

**Statutes**

Cal. Elec. Code. § 20012(f)(8) .............................................................. 20

Minn. Stat. § 480.065, subd. 3 ............................................................. 25

Minn. Stat. § 554.16 ............................................................................ 48

Minn. Stat. § 609.771 ..................................................................... *passim*

**Other Authorities**

15A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
§ 3904 (3d ed.) ..................................................................................... 8

Appellate Case: 25-1300     Page: 13     Date Filed: 05/19/2025 Entry ID: 5517985

# ISSUES

1.      Did Kohls or Franson have standing to seek injunctive relief?

      <u>Apposite Authorities</u>:
      *Christian Action League of Minn. v. Freeman*, 31 F.4th 1068 (8th Cir. 2022)
      *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992 (8th Cir. 2022)
      *Missouri v. Yellen*, 39 F.4th 1063 (8th Cir. 2022)

2.      Did the district court abuse its discretion by concluding that Franson failed to establish irreparable harm when she waited 16 months to challenge a law that she voted for?

      <u>Apposite Authorities</u>:
      *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889 (8th Cir. 2024)

3.      If the district court erred on standing or irreparable harm, should the Court remand or determine, in the first instance, whether Kohls and Franson are likely to succeed on the merits?

      <u>Apposite Authorities</u>:
      *Home Instead, Inc. v. Florance*, 721 F.3d 494 (8th Cir. 2013)
      U.S. Const. amend. I
      *United States v. Alvarez*, 567 U.S. 709 (2012)

1

## INTRODUCTION

Deepfakes are highly realistic video, audio, and other digital content generated by artificial intelligence. Deepfakes depict a person doing or saying something they did not do or say. They are rapidly transforming the misinformation landscape across the globe.

Minnesota and dozens of states across the political spectrum have enacted laws to respond to the unique threats posed by deepfakes to free and fair elections.[1] Minnesota's narrow law criminalizes the knowing or reckless dissemination of deepfakes that are intended to injure a candidate or influence an election. The law only applies to deepfakes that a reasonable person would perceive as real. And it only applies for brief windows of time immediately preceding elections and party nominating conventions.

Roughly six weeks before the 2024 election, Appellant Christopher Kohls, a content creator, and Appellant Mary Franson, a state legislator, brought a pre-enforcement challenge. They claimed that the law violated their First and Fourteenth Amendment rights. They sought a preliminary injunction against Appellee Keith Ellison, in his official capacity as the Minnesota Attorney General, and Chad M. Larson, the Douglas County Attorney. The district court denied preliminary-

---

[1] *Tracker: State Legislation on Deepfakes in Elections*, PUBLIC CITIZEN (May 13, 2025), *available at* https://www.citizen.org/article/tracker-legislation-on-deepfakes-in-elections/

injunctive relief because Kohls lacked standing and Franson failed to show irreparable harm.

This Court should affirm. Both Kohls and Franson failed to show standing to seek injunctive relief. Even if Franson had standing, she failed to show irreparable harm because she waited 16 months to challenge the deepfake law as unconstitutional. Finally, if the district court committed any error, this Court should remand or hold that Kohls and Franson are unlikely to succeed.

## STATEMENT OF THE CASE

I.  MINNESOTA SEEKS TO COMBAT DECEPTIVE DEEPFAKES IN THE LEADUP TO ELECTIONS.

### A. Deepfakes Pose a Serious Threat to Free and Fair Elections.

Deepfakes are a pernicious form of deceptive digital content created by AI. Add. 3-4; App. 122-23; R. Doc. 47, at 3-4. A typical deepfake is video or audio content showing someone saying and doing something that the person did not say or do. *Id*. In recent years, deepfakes have rapidly improved along with the technology to create them. *Id.* Creating a deepfake audio now requires only a snippet of the mimicked person's voice. App. 96; R. Doc. 24, at 7. And creating a deepfake video, with a vivid and lifelike image of the mimicked person, requires only a fraction of the time it took even a few years ago. *Id.* These cheap, realistic, and powerful deepfakes are designed to go viral and spread across social media. App. 99; R. Doc. 24, at 10.

3

Deepfakes' impact on elections has been felt worldwide. In Slovakia, for example, a pair of viral deepfakes likely swung a close parliamentary election. App. 99-101; R. Doc. 24, at 10-12. Similarly, on election day in Taiwan, a deepfake posted by a group affiliated with the Communist Party of China suggested that a leading candidate endorsed someone that he never did. *Id.* Closer to home, in Chicago, a deepfake video showed a mayoral candidate purportedly making inflammatory comments about law enforcement. *Id.* And, in New Hampshire, a deepfake audio mimicking then-President Biden was unleashed the day before a primary to discourage thousands from voting. *Id.*

**B. Minnesota Prohibits Deceptive Deepfakes Before Elections.**

In May 2023, a broad, bipartisan coalition in the Minnesota legislature acted to address the harmful effects of deepfakes in elections. *See* 2023 Minn. Laws ch. 58, § 2 (codified at Minn. Stat. § 609.771). The legislature refined the law in May 2024. The 2024 amendments imposed a stricter mens rea requirement for violations. 2024 Minn. Laws ch. 112, art. 2, §§ 76-78 (codified at Minn. Stat. § 609.771, subds. 2-4). The amendments also attached political penalties for candidates who disseminate prohibited deepfakes. *Id.*

Appellate Case: 25-1300    Page: 17    Date Filed: 05/19/2025 Entry ID: 5517985

In current form, Minnesota Statutes section 609.771[2] prohibits disseminating objectively misleading deepfakes only if "the person knows or acts with reckless disregard about whether the item being disseminated is a [deepfake]." Minn. Stat. § 609.771, subd. 2(a). The statute further conditions liability on three requirements. *Id.*, subds. 2-4. First, dissemination must be without the depicted individual's consent. *Id.* Second, the disseminator must intend to injure a candidate or influence an election result. *Id.*, subd. 2(a)(2). And last, the law applies only if disseminated during a narrowly proscribed time: either "within 90 days before a political party nominating convention" or "after the start of the absentee voting period prior to a presidential nominating primary, or a regular or special state or local primary or general election." *Id.*, subd. 2(a)(3)(i)-(ii).

The statute defines several key terms that are relevant to understanding its narrow scope. *Id.*, subd. 1 (defining "candidate," "deep fake," "depicted individual"). It also creates criminal and civil penalties and remedies. *Id.*, subds. 3, 4. The statute vests enforcement authority in the attorney general, county and city attorneys, the depicted individual, or the affected candidate. *Id.*, subds. 3, 4.

---

[2] This brief generally refers to section 609.771 as the "deepfake law," and it specifically notes when it discusses the revenge-porn laws that were enacted around the same time.

5

## II.    KOHLS AND FRANSON BRING A BELATED PRE-ENFORCEMENT CHALLENGE.

The Attorney General has never threatened enforcement of the deepfake law against Kohls or Franson. Yet in late September 2024, they brought this challenge under section 1983 to Minnesota's law. App. 8-58; R. Doc. 1, at 1-51. Kohls, who is based in Bali, creates and posts political parodies on social-media platforms. App. 12-13, 17; R. Doc. 1, at 5-6, 10. Last summer, on July 26, 2024, Kohls posted a video parodying U.S. presidential candidate Kamala Harris. *Id.* Kohls generated the video's narration through AI, interspersing it with real clips of Harris. *Id.* Kohls labeled the video as parody. *Id.* Harris makes many absurd statements, indicating to a reasonable viewer that the lampooning of Harris is not to be taken literally.[3] App. 19-22, 68; R. Doc. 1, at 17-18; R. Doc. 20-1, at 3.

Franson is a Minnesota state representative who was a candidate for re-election in 2024. App. 16; R. Doc. 1, at 9. Franson voted for the 2023 deepfake law but opposed the 2024 amendments. App. 32, 41; R. Doc. 1, at 25, 34. She retweeted a version of the July 26 video that, unlike Kohls' original post, lacked a parody disclaimer. App. 24-25, R. Doc. 1, at 17-18.

Kohls and Franson allege that the deepfake law infringes on their First Amendment free speech rights, and also allege that it is unconstitutionally vague in

---

[3]  The YouTube video is part of the record; it is also available here: https://www.youtube.com/watch?v=sVspeqNnoWM. App. 81; R. Doc. 20-2, at 3.

violation of the Fourteenth Amendment. App. 49-55; R. Doc. 1, at 42-48. They sued the Attorney General and the Douglas County Attorney and then sought a preliminary injunction. Add. 8; App. 17-18, 55, 127; R. Doc. 1, at 10-11, 48, Doc. 47 at 8.[4]

The district court denied the injunction. The court concluded that Kohls lacked standing. Add. 8-15; App. 127-34; R. Doc. 1, at 8-15. While holding that Franson had standing, the court also concluded that she failed to show irreparable harm because of her unreasonable delay in seeking injunctive relief. Add. 16-23; App. 135-42; R. Doc. 1, at 16-23.

## SUMMARY OF ARGUMENT

I.      Kohls and Franson lacked standing to seek preliminary-injunctive relief in this First Amendment pre-enforcement challenge. They seek only to post AI-generated parodies about politics, none of which are even arguably covered by Minnesota's law. Minnesota's law applies only to deepfakes that would fool a reasonable person into thinking that someone actually did or said something that they did not do. *See* Minn. Stat. § 609.771, subd. 1(c)(1). Parody is content which

---

[4] In opposing the preliminary injunction, the Attorney General submitted two expert declarations. App. 108-10; R. Doc. 46, at 1-3. Because one of the experts, Professor Jeff Hancock, cited some non-existent articles, the district court excluded his declaration and did not consider it when evaluating the preliminary-injunction motion. Add. 2 n.1; App. 121 n.1; R. Doc. 47, at 2 n.1. It is thus not at issue on appeal. *See* Br. 11 n.2.

Appellate Case: 25-1300      Page: 20      Date Filed: 05/19/2025 Entry ID: 5517985

cannot reasonably be interpreted as stating actual facts about someone. Parody is thus categorically excluded from the law's sweep. And even if the law encompassed parodies, Kohls and Franson faced no credible threat of enforcement.

II.     The district court did not abuse its discretion by finding that Franson failed to show irreparable harm. A plaintiff who seeks a preliminary injunction must show reasonable diligence. Franson waited more than 16 months to sue. And Franson inflicted her own injury by voting for the law that she now claims egregiously violated her constitutional rights.

III.     If the Court concludes that the district court erred on standing or irreparable harm, then it should remand so the district court can assess the likelihood of success on the merits in the first instance. This Court is one of review—not first view. District courts are best situated to assess all the evidence and all the preliminary-injunction factors. Remand is thus appropriate.

Even if the Court considers likelihood of success, it should affirm. Kohls and Franson seek to enjoin Minnesota's deepfake law in all applications. Facial challenges are hard to win, and Kohls and Franson do not engage with the legal framework for such challenges that the Supreme Court established in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). Within that framework, Minnesota's law has a legitimate sweep because much of the speech it targets falls outside the First

8

Amendment. And even if the law applies to some protected speech, it satisfies constitutional scrutiny.

## ARGUMENT

### I.    KOHLS AND FRANSON LACKED STANDING TO SEEK INJUNCTIVE RELIEF.

The Court reviews the district court's standing determinations de novo. *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 892 (8th Cir. 2024). Here, both Kohls and Franson lacked standing to seek injunctive relief.[5] First, Minnesota's deepfake law does not "arguably proscribe" their alleged conduct—disseminating AI-generated political parodies. The deepfake law excludes parody, and Kohls and Franson seek only to post obvious parodies. Second, even if the law might cover the parody videos posted by Kohls and Franson, neither faces a credible threat of enforcement. Last, if the Court believes there is a possibility that the statute should be construed as Kohls and Franson urge, the Court should certify whether the deepfake law covers parody to the Minnesota Supreme Court.

---

[5] Because this Court has an independent duty to assess subject-matter jurisdiction, it may examine Franson's standing without a cross-appeal. See *Const. Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011); *accord* 15A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3904 (3d ed.) ("A cross-appeal also is not necessary to challenge the subject-matter jurisdiction of the district court, under the well-established rule that both district court and appellate courts are obliged to raise such questions on their own").

**A.    Kohls and Franson Did Not Show First Amendment Injury.**

Article III of the Constitution restricts federal courts' subject-matter jurisdiction to cases and controversies. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). For a case or controversy to exist, a plaintiff must establish standing. *Id.* at 380. To establish standing, a plaintiff must show (1) that she has or likely will suffer an injury-in-fact, (2) a causal relationship between that injury and the defendant, and (3) that a favorable judicial decision will redress the injury. *Id.*

Injury-in-fact is what matters here. To obtain a preliminary injunction, Kohls and Franson needed to show that they intended to do something that is (1) arguably protected by the First Amendment, but (2) arguably proscribed by the deepfake law, and (3) that there was a credible threat of enforcement by the Attorney General. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1072 (8th Cir. 2022). This standard is "'forgiving'" but "not toothless." Add. 10; App. 129; R. Doc. 47, at 10 (quoting *L.H.*, 111 F.4th at 893). And Kohls and Franson did not meet their burden. Because the deepfake law does not arguably cover their past or planned speech, they suffered no cognizable injury that would justify injunctive relief.

10

### 1. The deepfake law does not apply to parody.

Appellants' principal standing argument is that the district court read a parody exception into the deepfake law. Br. 17-18. But the district court was right: the law's plain language excludes parody. And even if the statute were ambiguous, canons of statutory construction confirm that the statute excludes parody.

The deepfake law has yet to be interpreted by the Minnesota Supreme Court, so this Court may make a prediction about the law's meaning using state rules of statutory construction and other state-law materials or certify the question to the Minnesota Supreme Court.[6] *See Christian Action League*, 31 F.4th at 1072 (making prediction); *McKesson v. Doe*, 592 U.S. 1, 4-6 (2020) (certifying question). The starting point for statutory construction in Minnesota, as elsewhere, is the statute's text. When the text is clear and unambiguous, Minnesota courts apply its plain meaning. *In re Civil Commitment of Benson*, 12 N.W.3d 711, 715 (Minn. 2024). But if a statute is ambiguous, Minnesota courts consider legislative history and canons of statutory construction, including constitutional avoidance. *Id.* at 717-18. A statute is ambiguous when susceptible to more than one reasonable interpretation. *Id.* at 715.

The deepfake law unambiguously excludes parody. The statute applies only to deepfakes that are "so realistic that a reasonable person would believe it depicts speech or conduct of an individual *who did not in fact engage in such speech or*

---

[6] The reasons for certification are discussed below in Arg. Sec. I.C.

Appellate Case: 25-1300    Page: 24    Date Filed: 05/19/2025 Entry ID: 5517985

*conduct.*" Minn. Stat. § 609.771, subd. 1(c)(1) (emphasis added). In other words, the statute covers only deepfakes that would fool a reasonable person into thinking that the depicted person said or did something that they did not.[7]

By prohibiting only those depictions that would fool a reasonable person, the statute categorically excludes parody from its sweep. For constitutional purposes, parody is speech that "cannot [reasonably] be interpreted as stating actual facts" about the depicted person. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (internal quotation marks omitted) (alteration in original). And here, deepfakes that "cannot 'reasonably be interpreted as stating actual facts'" about the depicted person fall outside the statute's scope. *Id.* The statute thus excludes parody from its reach.[8]

Even if the statute were ambiguous, the Minnesota Supreme Court would interpret the statute to exclude parody for at least two reasons. First, Minnesota courts apply the constitutional-avoidance canon, which requires construing statutes to avoid constitutional conflicts. *State v. Mauer*, 741 N.W.2d 107, 115 (Minn. 2007);

---

[7] Appellants also, in passing, accuse the statute of being "vague" because it supposedly asks whether material is "'realistic' to a 'reasonable person.'" Br. 13, 16. But the "reasonable person" standard is pervasive in law, with a "settled legal meaning[]." *United States v. Williams*, 553 U.S. 285, 306 (2008); *Reasonable Person*, *Black's Law Dictionary* (12th ed. 2024) (defining "reasonable person" as a "[a] hypothetical person used as a legal standard").

[8] Kohls, in challenging a California deepfake law, has acknowledged that "a reasonable person understands that [his] videos are not meant to be taken literally." Pls.' Mem. in Supp. Mot. for Summ. J. Against AB 2839 at 22, *Kohls v. Bonta*, No. 2:24-cv-02527-JAM-CKD (E.D. Cal. Mar. 7, 2025), ECF No. 45-1.

*see also Christian Action League*, 31 F.4th at 1073 (applying constitutional-avoidance canon in interpreting Minnesota statute). If the deepfake statute were construed to encompass parody, it would raise "a serious constitutional question." *Mauer*, 741 N.W.2d at 115. Minnesota courts would construe the statute to avoid that potential constitutional conflict.

Second, legislative history reinforces that the statute excludes parody. One legislative sponsor noted that the deepfake law did not apply to physical impersonations so Saturday Night Live fans could "rest easy." App. 34-35; R. Doc. 1, at 27-28. But the legislative sponsor also more broadly emphasized that the law did not apply to "the lampooning of candidates." *Id.* Instead, the law was aimed at "the creation of videos or digital things that are meant to depict candidates or people doing things that they have not done," which "people can't look at and tell that they did not do those things." *Id.* In a later hearing, the same legislative sponsor stated that "people like to make parodies and jokes and things about elected officials, as is their right to do under the First Amendment." App. 65; R. Doc. 20, at 7.[9]

### 2. Kohls' and Franson's contrary statutory arguments lack merit.

Despite the statute's plain language, Kohls and Franson insist that the district court erred because: (1) their proffer of an interpretation of the statute that covered

---

[9] A recording of this Minnesota Senate hearing is available here: https://www.lrl.mn.gov/media/file?mtgid=1049230. App. 65; R. Doc. 20, at 7.

13

their conduct was enough to render that conduct arguably proscribed; and (2) the legislative history shows that a parody exception was considered and rejected. Br. 17-18. They are wrong on both counts.

First, a plaintiff cannot manufacture standing simply by proffering an interpretation of the challenged statute that conflicts with its plain language. The district court correctly recognized that analyzing standing required (1) determining what the statute means, and then (2) assessing whether the statute arguably proscribes the alleged conduct. Add. 9-10; App. 128-29; R. Doc. 47, at 9-10. While the arguably proscribed standard can be forgiving, it does not allow a district court to skip statutory construction.

This Court's decision in *Christian Action League* illustrates the point. In that case, an anti-pornography advocacy group brought a First Amendment challenge to a Minnesota statute that allowed victims to obtain restraining orders against harassers. 31 F.4th at 1071. The plaintiff sought to enjoin the county attorney from enforcing the harassment statute when the group launched email and postcard campaigns against certain companies. *Id.* The district court held that the plaintiff lacked standing because Minnesota law did not prohibit their conduct. *Id.* Applying Minnesota's principles of statutory construction, this Court affirmed. *Id.* at 1072-74. It held that the harassment statute, when properly construed, did not prohibit the email-or-postcard campaign. *Id.*

14

So too here. The district court had to interpret the statute before it could assess whether it arguably proscribed Kohls and Franson's speech. And the district court got the statute right.

Second, Kohls and Franson mischaracterize the legislative history by claiming that the Minnesota legislature considered but rejected a parody exception. Br. 17-18. The deepfake law was passed with others banning deepfake revenge porn. App. 35-36; R. Doc. 1, at 28-29; 2023 Minn. Laws ch. 58 §§ 1, 3. The legislature considered, and then rejected, a parody exception that would apply to the revenge-porn laws, not the electoral one. App. 35-36; R. Doc. 1, at 28-29.

Although Kohls and Franson describe this decision as "odd[]," it makes sense when comparing the electoral and revenge-porn laws. App. 35; R. Doc. 1, at 28. As discussed above, the electoral law applies to deepfakes depicting speech or conduct in which the purported speaker did not engage. Minn. Stat. § 609.771, subd. 1(c)(1). By contrast, the revenge-porn statutes are broader: they do not require that the depicted person never actually engaged in the speech or conduct. *Id.* §§ 604.32, subd. 1(b)(1), 617.262, subd. 1(b)(1). They instead apply more broadly to any life-like representation, even if it would not be perceived as a real record of events.

The difference in scope reflects the legislature targeting different harms. Deepfake revenge porn causes harm by using a person's likeness to produce pornographic material—regardless of whether a reasonable person would believe

15

that it reflects the depicted person's actual speech or conduct. For instance, a deepfake video depicting realistic sexual acts occurring on Mars could still violate the revenge-porn laws, even though no one would believe that the acts depicted happened in outer space. In the election context, however, the harm stems not from appropriating a person's likeness or identity but from the impact on a reasonable person's understanding of reality. The legislature thus adopted a narrower definition of deepfake in the electoral context—a definition that categorically excludes parody.

Kohls and Franson ignore the differences between the electoral and revenge-porn laws when they make their argument from legislative history. Because parody content could never, by definition, qualify as a deepfake under the electoral law, there was no need to include a separate exception.

### 3. The deepfake law does not arguably proscribe Kohls' or Franson's conduct.

After properly construing the deepfake law, the district court correctly concluded that none of Kohls' speech was arguably proscribed by Minnesota's law because it was parody. But the district court should have reached the same conclusion as to Franson because she only posted obvious parodies too.

#### i. Because Kohls posts only obvious parodies, his speech is not arguably proscribed.

In moving for a preliminary injunction, Kohls focused narrowly on his July 26 video lampooning Kamala Harris. App. 3; R. Doc. 11. He acknowledged that the

16

July 26 video was "obviously far-fetched" and "over-the-top." App. 22; R. Doc. 1, at 15. And he affirmed that he labelled the video as parody. *Id.* In the complaint, Kohls identified only one other video: an imaginary phone call between Harris and then-vice presidential candidate Tim Walz, in which Harris describes the duo as "radical communists" and then mocks Walz's "perceived political liabilities." App. 23-24; R. Doc. 1, at 16-17. Like the July 26 video, Kohls labelled the Harris-Walz video, which was posted August 9, as parody. *Id.* And, in opposing injunctive relief, the Attorney General compiled several other videos that Kohls posted in the runup to the 2024 election. App. 81-89; R. Doc. 20-2, at 3-11. All of those were labelled as parodies too. *Id.*

With that record, the district court properly concluded that Kohls lacked standing to seek injunctive relief. The deepfake law does not apply to parodies, the Attorney General does not interpret the law to cover parodies, and Kohls only posted parodies that were labelled as such. Kohls therefore did not show that the law arguably proscribed his speech. *See Missouri v. Yellen*, 39 F.4th 1063, 1069-70 (8th Cir. 2022) (no standing to challenge statute when conduct was not arguably proscribed by statute on its face or the enforcing agency's interpretation).

On appeal, Kohls nonetheless insists that the district court "departed" from the complaint because Kohls did not affirmatively allege that he never publishes videos without the parody disclaimer. Br. 19. This argument fails for two reasons.

17

First, Kohls undersells the evidentiary burden that applies when a party seeks a preliminary injunction. Kohls repeatedly treats his standing burden for a preliminary injunction as the same burden that applies when a plaintiff opposes a motion to dismiss.[10] *E.g.*, Br. 18-19, 21. But that is not right. For preliminary injunctions, a plaintiff must make a "clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (cleaned up).[11] The "clear showing" burden is often the same as the burden that applies at summary judgment. *E.g.*, *Do No Harm v. Pfizer, Inc.*, 126 F.4th 109, 113-14 (2d Cir. 2025); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020); *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). Indeed, unless discovery is needed to prove standing, a plaintiff must move beyond allegations and provide evidence that demonstrates standing. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108-09 (10th Cir. 2024) (citing *Murthy*, 603 U.S. at 58).

---

[10] The parties agreed to defer the deadline for the Appellees to respond to the complaint until after the preliminary-injunction motion was resolved. After the district court denied the injunction, Appellees answered.

[11] Kohls generally relies on cases that predate *Murthy*, Br. 18-19, except for *United States v. Iowa*, which was vacated a few days before Kohls' brief was filed. 126 F.4th 1334 (8th Cir. 2025), *reh'g granted and opinion vacated*, No. 24-2265, 2025 WL 1113191 (8th Cir. Apr. 15, 2025). Moreover, none of the Eighth Circuit cases either (1) involved a standing dispute at the preliminary-injunction stage or (2) engaged in a meaningful analysis of the evidentiary-burden issue.

Appellate Case: 25-1300     Page: 31     Date Filed: 05/19/2025 Entry ID: 5517985

Here, Kohls essentially rests on his complaint. While the complaint was verified, he cannot protest that the district court failed to draw inferences from evidence he did not submit. The only evidence—that Kohls posts videos with parody disclaimers—in fact contradicts his position. App. 12-13, 22-24; R. Doc. 1, at 5-6, 15-17; *accord* App. 81-89; R. Doc. 20-2, at 3-11. A preliminary injunction requires more.

Second, even under the motion-to-dismiss standard, Kohls failed to meet his standing burden. Kohls never alleged that he posts videos without parody disclaimers. And district courts are not required to "conjure up unpled allegations to save a complaint."[12] *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 795-96 (8th Cir. 2021) (cleaned up).

### ii. Because Franson posts only obvious parodies, her speech is not arguably proscribed.

Kohls also argues that the district court "sliced the bologna too thin" by holding that Franson's retweet was "arguably proscribed" because it lacked a

---

[12] In a footnote, Kohls claims that he does re-post his content without disclaimers. Br. 19 n.3. But appellate courts cannot consider materials outside the record, and there is nothing in the record on appeal to support that claim. *United States v. Nissen*, 666 F.3d 486, 488 n. 2 (8th Cir. 2012). But if extra-record materials are relevant, Kohls has represented in his challenge to California's law that all his videos that contain AI-generated content are labelled as parody. Pls.' Mem. in Supp. Mot. for Summ. J. Against AB 2839 at 7-8, 32, *Kohls v. Bonta*, No. 2:24-cv-02527-JAM-CKD (E.D. Cal. Mar. 7, 2025), ECF No. 45-1.

Appellate Case: 25-1300     Page: 32     Date Filed: 05/19/2025 Entry ID: 5517985

disclaimer. Br. 21. Kohls is right, but for the wrong reason: the district court should have also concluded that Franson's speech was not arguably proscribed.

The district court concluded that Franson's retweet of the July 26 video, without a parody disclaimer, could at least arguably fool a reasonable person. Add. 12-15; App. 131-34; R. Doc. 47, at 12-15. But that conclusion simply cannot be squared with the July 26 video. As Franson admitted, she "knew that the narration in the video was not actually said by Kamala Harris." App. 25; R. Doc. 1, at 18. Even a small sampling of Harris's supposed narration in the video shows why:

- "I was selected because I am the ultimate diversity hire."

- "I may not know the first thing about running the country, but remember, that's a good thing if you're a deep state puppet."

- "Joe [Biden] taught me rule number one: carefully hide your total incompetence."

App. 20; R. Doc. 1, at 13. These absurd statements—plus others—make it self-evident that the July 26 video is parody that falls outside the reach of Minnesota's deepfake law.

In concluding otherwise, the district court highlighted comments from a handful of others—including California Governor Gavin Newsom, Senator Amy Klobuchar, and the leader of Public Citizen—criticizing the video. Add. 13-14; App. 132-33; R. Doc. 47, at 13-14. But Governor Newsom was commenting on California

20

law, [13] while Senator Klobuchar was discussing X's terms of service. App. 44-46; R. Doc. 1, at 37-39. None were commenting on Minnesota's law. And neither Kohls nor Franson allege that any law enforcement authority in Minnesota (including the Appellees) has claimed or even suggested that the July 26 video violates Minnesota's law.

### 4. Kohls and Franson did not show a credible threat of enforcement.

Even if Kohls and Franson could show that the law arguably proscribes their planned speech, neither faces a credible threat of enforcement by the Attorney General. If a statute has not been enforced, a plaintiff must establish a substantial likelihood of future enforcement. *California v. Texas*, 593 U.S. 659, 670 (2021).

Kohls and Franson did not meet their burden. Neither claimed—let alone established—that any Minnesota authority has ever threatened to enforce the deepfake law against them for disseminating AI-generated parodies about politics. Quite the opposite: Kohls and Franson seek to enjoin the Attorney General from enforcing an interpretation of the deepfake law that he has "explicitly disclaimed."

---

[13] One of Kohls' main criticisms of California's law is that it "does not require showing that content actually fools a reasonable person." Pls.' Mem. in Supp. Mot. for Summ. J. Against AB 2839 at 12, 35, *Kohls v. Bonta*, No. 2:24-cv-02527-JAM-CKD (E.D. Cal. Mar. 7, 2025), ECF No. 45-1. According to Kohls, California's law only requires content to "'falsely appear . . . authentic' *in some respect* to violate the law." *Id.* at 12 (quoting Cal. Elec. Code. § 20012(f)(8)). Minnesota's law, by contrast, reaches only those deepfakes that would fool a reasonable person.

Appellate Case: 25-1300     Page: 34     Date Filed: 05/19/2025 Entry ID: 5517985

*See Yellen*, 39 F.4th at 1070. In those circumstances, the threat of enforcement is speculative at best—and speculation about enforcement is not sufficient for standing. *See Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022) (no standing when plaintiff speculated about enforcement of statute based on an interpretation that agency had not endorsed).

Indeed, one of the most common ways that plaintiffs demonstrate standing in First Amendment pre-enforcement challenges is by showing that the statute's existence has chilled their speech. *See, e.g.*, *Missourians for Fiscal Accountability v. Klahr*, 83.0 F.3d 789, 794-95 (8th Cir. 2016). But Kohls and Franson do not—and cannot—show chill. *See Sch. of the Ozarks*, 41 F.4th at 1000-01 (lack of self-censorship confirmed that no First Amendment injury existed); *accord L.H.*, 111 F.4th at 895. On the contrary, Kohls and Franson repeatedly boast that they are undeterred by the deepfake law, and the record refutes that the law has deterred their speech in anyway. App. 66-76; R. Doc. 20-1, at 1-11 (compiling various social media posts before and after the July 26 video). And if Kohls and Franson claim that the deepfake law chills the speech of *others*, they have not proffered any evidence to support those conclusory allegations. *See Sch. of the Ozarks*, 41 F.4th at 1001 (conclusory allegations of third-party chill insufficient).

In the end, Kohls and Franson rely on the mere existence of the deepfake law as supplying the credible threat of enforcement, and they cite a handful of cases to

22

that effect. Br. 21-22. But in each case, the plaintiffs made non-conclusory allegations of chill on their speech. *See, e.g.*, *Parents Defending Educ. v. Linn Marr Cmty. Sch. Dist.*, 83 F.4th 658, 664 (8th Cir. 2023) (specifically alleging that plaintiffs refrained from using sex-specific pronouns to avoid violating school policy). Here, by contrast, Kohls and Franson make no plausible claim of chill on their speech—and the absence of any chill only reinforces that Kohls and Franson face no credible threat of enforcement.

## B. Kohls' New "Resharing" Theory of Injury Fails Too.

On appeal, Kohls claims that the district court "ignored" pocketbook injuries he will purportedly suffer if the deepfake law chills others from resharing his content. This argument fails because it is forfeited and, even if not forfeited, it hinges on speculation about third-party conduct.

Because Kohls never made this argument to the district court, it is forfeited on appeal. *See Sleep No. Corp. v. Young*, 33 F.4th 1012, 1020 n.3 (8th Cir. 2022). True, Kohls and Franson collectively alluded to how Minnesota's law could chill others from creating content they want to consume and from resharing their posts. App. 3; R. Doc. 11, at 16. But in seeking a preliminary injunction, Kohls never argued that third-party chill would cause him *monetary* harm. *See generally* App. 3-4; R. Docs. 11, 28; App. 163-66, 201-03; Tr. 18-21, 56-58. And he certainly did not

23

submit evidence of any likely harm. The district court should not be faulted for ignoring an argument that Kohls never made.

Regardless, Kohls' belated theory of standing fails on the merits. Federal courts cannot generally "redress injury that results from the independent action of some third party not before the Court." *Murthy*, 603 U.S. at 57 (internal quotation marks omitted). Kohls' resharing theory violates this "bedrock principle." *Id.* It hinges on speculation about the decision-making of third-party social-media users. *Id.* And it hinges on speculation about those social-media users' "subjective fear" of enforcement. *See Clapper v. Amnesty Int'l USA,* 568 U.S. 417 n.7 (2013) (rejecting First Amendment standing theory "based on third parties' subjective fear of surveillance" under challenged law). Speculation about third-party decision-making—coupled with speculation about their subjective fears—cannot create standing.[14]

Even if the theory were viable, no evidence in the record supports it. Kohls points to a single, conclusory allegation about third-party chill in the complaint. Br. 23-24. But conclusory allegations of third-party chill need not be credited, and they

_____

[14] Kohls principally relies on *Department of Commerce v. New York*, to argue that Minnesota's deepfake law will have "'predictable effect . . . on the decisions of third parties.'" Br. 24 (quoting 588 U.S. 752, 768 (2019)) (alterations in original). But there, the plaintiffs offered specific allegations—and evidence later credited at trial—that a census question about citizenship would deter the non-citizen response rate. *See Murthy*, 603 U.S. at 68 n.8 (distinguishing *Commerce* for that reason). No comparable evidence about third-party behavior exists here.

24

are insufficient to establish First Amendment injury. *See Sch. of the Ozarks*, 41 F.4th at 1001 (no standing when religious school offered only conclusory allegation that other colleges would be chilled by challenged action); *cf. Mo. Roundtable for Life v. Carnahan*, 676 F.3d 665, 673 (8th Cir. 2012) (conclusory allegation of subjective chill insufficient to establish First Amendment injury). Nor can Kohls bootstrap a conclusory allegation of economic injury to his vague and unsupported allegation of third-party chill to create standing. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 285 (3d Cir. 2018) (plaintiffs must offer more than conclusory allegations of economic injury). This Court should thus reject Kohls' resharing theory of injury.

### C.     If the Court Has Doubts, It Should Certify the Parody Question to the Minnesota Supreme Court.

Deciding whether Kohls and Franson have standing turns on the meaning of Minnesota's deepfake law. If the Court has any doubts about the statute's scope, the Court should certify whether the statute covers parody to the Minnesota Supreme Court.

Federal circuit courts may certify legal questions to the Minnesota Supreme Court "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this state." Minn. Stat. § 480.065, subd. 3. Here, the parties vigorously dispute whether the deepfake law covers parody. Resolving that question

25

is critical to assessing Kohls and Franson's standing. It is also critical to the merits: the statute's scope has a direct effect on whether Kohls and Franson can show, in this facial challenge, that "'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Moody*, 603 U.S. at 723-24 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).

Certification is thus appropriate here should the Court have any doubt about the deepfake law's meaning. Whenever a state statute is challenged on First Amendment grounds, federal courts should "ensure that any conflict . . . between state law and the First Amendment is not purely hypothetical." *McKesson v. Doe*, 592 U.S. 1, 6 (2020). Indeed, certification matters most when a federal court must assess constitutional challenges to state laws that have yet to be reviewed by the state's highest court. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997). Rather than engage in guesswork, federal courts can get a definitive interpretation of state law that may simplify or eliminate federal constitutional questions. *Id.* Declining certification, and engaging in guesswork, is especially "gratuitous" when certification to a state supreme court is available. *Id.* (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 510 (1985) (O'Connor, J., concurring)); *see*, *e.g.*, *Ind. Right to Life v. Morales*, 66 F.4th 625, 631-33 (7th Cir. 2023) (certifying question to Indiana Supreme Court in pre-enforcement

26

constitutional challenge to state election code). The need for certification is only heightened when a case concerns novel, emerging technology like deceptive AI-generated deepfakes. *See McKesson*, 592 U.S. at 5 (novel issues of state law may warrant certification).

Thus, if the Court questions the statute's scope, the Court should certify the following question to the Minnesota Supreme Court: Does content that qualifies as parody categorically fall outside the scope of Minnesota Statutes section 609.771?

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT FRANSON FAILED TO SHOW IRREPARABLE HARM.

The Court reviews the denial of a preliminary injunction for abuse of discretion. *Padda v. Becerra*, 37 F.4th 1376, 1381 (8th Cir. 2022). Here, the district court did not abuse its discretion when it concluded that Franson failed to show irreparable harm. A preliminary injunction is an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Whether that extraordinary remedy should issue requires courts to consider: (1) the threat of irreparable harm; (2) balancing that harm against the injury that granting the injunction will inflict on other parties; (3) the likelihood of success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). In First Amendment cases, failure to show irreparable harm is a sufficient basis to deny a preliminary injunction. *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893-94 (8th Cir. 2024).

Appellate Case: 25-1300    Page: 40    Date Filed: 05/19/2025 Entry ID: 5517985

Here, the district court held that Franson's unreasonable delay in suing belied her argument that she would suffer irreparable harm absent an injunction. The court did not abuse its discretion in so concluding.

### A. The District Court Did Not Abuse Its Discretion in Concluding That Franson's Delay Precludes a Finding of Irreparable Harm.

A party requesting a preliminary injunction must generally show reasonable diligence. *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). An unreasonable delay in seeking the preliminary injunction can undermine a showing of irreparable harm, and it is a "sufficient ground" to deny an injunction. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997-98 (8th Cir. 2023) (13-month delay undercut claim of irreparable harm); *accord Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 17 F.4th 793, 805-06 (8th Cir. 2021) (same for one-year delay); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 737-38, 746 (9th Cir. 2015) (en banc) (same for three-month delay).

Franson was aware of the deepfake law by at least May 2023 because she voted for it. Still, she waited 16 months to file suit and almost 17 months to seek a preliminary injunction. The district court rightly held that this delay confirmed that the harm she supposedly would suffer is not serious enough to justify the extraordinary remedy of a preliminary injunction. Add. 20; App. 139; R. Doc. 47, at 20. Indeed, Franson's lack of diligence has only persisted since the district court denied injunctive relief, which further cuts against irreparable harm. *See Hanson v.*

28

*District of Columbia*, 120 F.4th 223, 245-46 (D.C. Cir. 2024). Franson consented to a stay of the district court litigation pending resolution of this appeal, and she never sought expedited review from this Court. These "unhurried litigation tactics counsel against a finding of irreparable harm." *Id.* at 246.

Franson raises two arguments against this conclusion. First, Franson argues that she was not injured by the deepfake law until she retweeted Kohls' video in July 2024. Br. 27-32. But Franson forfeited this argument by failing to raise it below. *See Perry v. Precythe*, 121 F.4th 711, 716 (8th Cir. 2024). The Attorney General argued to the district court that the 16-month delay between when Franson voted for the law and when Franson sued showed lack of irreparable harm. App. 4; R. Doc. 19, at 46. Franson replied only with arguments about her subjective awareness of the statute's scope; she made no argument that the law did not (supposedly) violate her rights in 2023. *See* App. 5; R. Doc. 28, at 17. Franson cannot argue for the first time on appeal that she delayed because she lacked standing before July 2024.

But even if the Court reaches this argument, it is meritless. Franson sought a pre-enforcement, facial injunction against enforcement of the deepfake statute in toto. Such challenges turn on the scope of the law—not on its application to facts that have occurred. *See Moody*, 603 U.S. at 724. In other words, the Court does not look beyond the statute's text. *Hershey v. Jasinski*, 86 F.4th 1224, 1231 (8th Cir. 2024). And nearly all of the substantive prohibitions of the deepfake statute's text

29

Appellate Case: 25-1300    Page: 42    Date Filed: 05/19/2025 Entry ID: 5517985

were the same in October 2024 when Franson sought a preliminary injunction as they were 17 months prior in May 2023.

The cases Franson cites are not to the contrary. Both *Corner Post, Inc. v. Board of Governors of the Federal Reserve System* and *Virden v. City of Austin* stand for the uncontroversial proposition that a claim accrues when a plaintiff suffers an injury. *Corner Post, Inc.*, 603 U.S. 799, 809 (2024); *Virden*, 127 F.4th 960, 966 (5th Cir. 2025). But that simply invites the question: when did Franson suffer a First Amendment injury? The third case cited by Franson answers that question. As Kohls and Franson repeatedly emphasize, "the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute." *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011). The record shows that Franson has not been chilled by the deepfake law, and therefore lacks standing. *See supra* Arg. Sec. I.A. But if this Court holds otherwise, Franson would have been as just chilled in May 2023 as she was 17 months later when she finally sought a preliminary injunction.

Second, Franson argues that preliminary injunctions in the First Amendment context are somehow special, so her delay is effectively irrelevant. Br. 33-38. But this Court recently and emphatically rejected this argument. In *Hotchkiss*, the plaintiff argued that the supposed infringement of First Amendment rights, even for minimal periods of time, always causes irreparable injury. 115 F.4th at 893. This

30

Court disagreed: even in the First Amendment context, an unreasonable delay is a sufficient basis to conclude that a showing of irreparable harm has not been made. *Id.* at 893-94.

None of Franson's cases hold otherwise. She places considerable reliance on the fact that supposed delays in *281 Care Committee* and *St. Paul Area Chamber of Commerce v. Gaertner* did not preclude injunctive relief. Br. 33-34. But both cases appealed dismissals of complaints seeking *permanent* injunctive relief. Neither concerned how unreasonable delay affects the equities at the *preliminary* injunction stage (or discussed unreasonable delay at all). *See 281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014) [hereinafter *281 Care Committee II*]; *St. Paul Chamber of Com. v. Gaertner*, 439 F.3d 481, 483 (8th Cir. 2006). Preliminary injunctive relief, by contrast, "is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Cases about permanent injunctions do not speak to whether the speedy and urgent remedy of a preliminary injunction is warranted.

Franson also relies on a line of pre-*Hotchkiss* cases to suggest that in the First Amendment context, a likelihood of success on the merits makes delay irrelevant. Br. 33. But the Supreme Court has held that reasonable diligence is required even in cases raising constitutional claims. *Benisek*, 585 U.S. at 159. Moreover, each of

31

Franson's cases derives that conclusion from a cursory citation to the Supreme Court's plurality opinion in *Elrod v. Burns*, which broadly stated that the loss of First Amendment freedoms, even for short periods, qualifies as irreparable injury. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)), *overruled on other grounds*, *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 691 (8th Cir. 2012); *Straights & Gays for Equal. (SAGE) v. Osseo Area Schs.*, 471 F.3d 908, 913 (8th Cir. 2006) (same); *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (same). But in *Hotchkiss*, this Court carefully parsed the various opinions of *Elrod* to conclude that Franson's argument—that delay is irrelevant in First Amendment cases—"is simply not the law." 115 F.4th at 894. The Court instead reaffirmed that a preliminary injunction requires reasonable diligence. *Id.* And Franson was not reasonably diligent here.

Franson makes four other arguments that merit brief responses. First, she argues that she lacked standing until 2024 because the legislature added the forfeiture-of-office penalty that year. Br. 37. But Franson's challenge is not limited to the enhanced penalties from 2024. Instead, Franson challenges the deepfake law overall, and the substantive elements of the deepfake law were all in place in May 2023 (and became effective on August 1 of that year). Thus, the penalty-enhancements in 2024 have no bearing on whether she could have sought an injunction in May 2023.

Second, Franson argues that the district court erred in finding that there were elections in 2023 to which the deepfake law could have applied. Br. 29. But the district court was right: the deepfake law applied to elections in August, November, and December of 2023. Minn. Stat. § 609.771, subd. 2(1) (Supp. 2023); *Election Results*, MINN. SEC'Y OF STATE.[15]

Third, Franson suggests that conduct by her political opponent amplified her risk of enforcement in 2024. Br. 37. Any such enforcement, however, would be by that political opponent—not the parties here. Accordingly, regardless of whether that amplification is real, it is unrelated to Franson's ability to seek an injunction against the Attorney General.

Fourth, Franson argues that finding delay here would somehow "insulate[] unconstitutional laws from challenges." Br. 29. But nothing about Franson's unreasonable delay precludes her from obtaining final relief. Rather, that delay goes only to whether she deserves the extraordinary remedy of a preliminary injunction before a final determination is made.

### B. The District Court Did Not Abuse Its Discretion in Concluding That Franson's Injury Is Self-Inflicted.

The district court also held that Franson had failed to establish irreparable harm for a second, independent reason: any injury Franson suffered was self-

---

[15] Available at https://www.sos.mn.gov/elections-voting/election-results/ (last visited May 17, 2025).

inflicted because Franson voted to enact the deepfake statute. Add. 21; App. 140; R. Doc. 47, at 21. The district court also did not abuse its discretion in denying a preliminary injunction on this basis.

Nearly every circuit has held that self-inflicted harms are not irreparable. *S.F. Real Est. Invs. v. Real Est. Inv. Tr. of Am.*, 692 F.2d 814, 818 (1st Cir. 1982); *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir. 1993); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021); *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129-30 (9th Cir. 2024); *Salt Lake Trib. Publ'g Co. v. AT & T Corp.¸* 320 F.3d 1081, 1106 (10th Cir. 2003). An injury is self-inflicted if a party knows its conduct will result in the injury but chooses to engage in the conduct anyway. *See Texas v. Biden*, 10 F.4th at 558. This can include legislative action. *E.g.*, *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1292 n.5 (11th Cir. 2021) (recognizing legislature created self-inflicted injury by passing a statute that conflicted with federal law).

The district court correctly concluded that Franson's injury, if any, was self-inflicted. She voted to make election-related deepfakes illegal in Minnesota; she now seeks to challenge the statute that she voted for. Any injury that the deepfake law supposedly causes her cannot be the basis for irreparable harm.

34

Franson's sole response is that political reality somehow made it impossible for Franson to oppose the bill that contained the deepfake statute. Br. 31-32. Maybe voting against the full package of deepfake laws would have been politically difficult for Franson. But it was still a choice. The district court did not abuse its discretion in holding Franson accountable for her choice.

III. **KOHLS AND FRANSON ARE UNLIKELY TO PREVAIL ON THE MERITS THAT THE DEEPFAKE LAW IS FACIALLY UNCONSTITUTIONAL.**

Even if the Court reaches the likelihood-of-success on the merits, it should either remand or affirm. Because the district court did not reach the issue, it should address the issue first. Alternatively, the Court should conclude that Kohls and Franson are unlikely to succeed.

**A. If the Court Reaches Likelihood of Success, It Should Remand.**

Kohls and Franson devote a quarter of their argument to an issue not addressed by the district court: the merits of their First Amendment claims. Br. 38-46. For the reasons discussed above, the Court need not reach this issue because the district court correctly concluded that Kohls lacked standing and Franson will not suffer irreparable harm absent an injunction. But if the Court concludes that the district should have reached that question, the appropriate response is to remand.

When a district court declines to address all the injunctive factors, this Court "typically do[es] not address other factors for the first time on appeal." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024)

(internal quotation marks omitted). District courts are best situated to evaluate all of the evidence and to consider all of the preliminary-injunction factors. *Id.* The Court's common practice is thus to remand when the district court did not make findings on all factors. *See Home Instead, Inc. v. Florance*, 721 F.3d 494, 500 (8th Cir. 2013) (remanding for that purpose); *Lankford v. Sherman*, 451 F.3d 496, 513 (8th Cir. 2006) (same); *Blue Moon Ent., LLC v. City of Bates*, 441 F.3d 561, 566 (8th Cir. 2006) (same).

The same approach should prevail here. If the Court concludes the district court should have considered the merits of Appellants' First Amendment claims, it should remand to give the district court the first opportunity to do so.

### B. If the Court Declines to Remand, Kohls and Franson are Unlikely to Succeed.

If the Court does reach the First Amendment issues, the Court should hold that Kohls and Franson are unlikely to prevail on the merits.

Facial challenges are "hard to win." *Moody*, 603 U.S. at 723. A facial First Amendment challenge can prevail only if a substantial number of the statute's applications are unconstitutional, judged in relation to its plainly legitimate sweep. *Id*. at 723-24. Applying *Moody*, this Court has outlined a three-step framework for facial challenges. *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 669-70 (8th Cir. 2024). First, assess the challenged law's scope, which includes considering the activities the challenged law prohibits or regulates. *Id.* Second,

36

determine which of those applications violate the First Amendment. *Id.* And last, measure the unconstitutional applications against the remaining provisions. *Id.*

Kohls and Franson failed to engage with this framework at the district court, and they repeat that error here. Indeed, they do not even cite *GLBT Youth* or *Moody*, despite bearing the burden of establishing entitlement to relief. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423, 441 (1974). Their failure to grapple with any part of the *Moody* test is alone a sufficient basis for affirming the district court's decision to deny a preliminary injunction. *See GLBT*, 114 F.4th at 670. And properly applied, that analysis makes clear that they are unlikely to prevail.

## 1. The deepfake law contains important limitations on its scope.

The first step in a facial challenge is assessing the challenged law's scope. The deepfake law prohibits:

- disseminating a deepfake;

- if the person knows or acts with reckless disregard about whether the item being disseminated is a deepfake;

- without the depicted individual's consent;

- with the intent to injure a candidate or influence an election's result; and

- dissemination occurs within 90 days of a nominating convention or after absentee voting has begun, which is 46 days before an election.

37

Minn. Stat. §609.771, subd. 2(a). Moreover, as discussed extensively above, the law defines deepfake as a false depiction "that is so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct." *Id.* § 609.771, subd. 1(c)(1).

These requirements place four important constraints on the law's scope. First, by confining deepfakes to creations so realistic that they would fool a reasonable person, the law excludes parodies. Second, the law applies only if a person knows the deepfake is false or recklessly disregards its probable falsity. Third, the disseminator must intend to injure a candidate or more generally influence an election. And fourth, the law applies only in limited periods: shortly before and while people are casting votes.

> **2. The First Amendment does not protect the false speech that the deepfake law prohibits.**

The next step in the facial-challenge analysis is to determine which applications of the law, if any, violate the First Amendment. While free speech rights are broad, the First Amendment does not protect certain categories of speech. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). The speech affected by the deepfake law falls into at least two unprotected categories: (i) false speech that causes legally cognizable harm, and (ii) false speech made to accomplish a fraud.

38

###### i. Deepfakes are false speech that cause legally cognizable harm.

States can proscribe "intentionally false speech undertaken to accomplish a legally cognizable harm . . . without violating the First Amendment." *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 786 (8th Cir. 2021). If the false speech involves matters of public concern, it may be prohibited when made with "actual malice," which requires knowledge or reckless disregard of falsity. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755 (1985).

The deepfake law targets this class of unprotected speech. The proscribed deepfakes are definitionally false: the law applies only to deepfakes depicting conduct that did not happen. Minn. Stat. § 609.771, subd. 1(c)(1). Moreover, the law proscribes dissemination of deepfakes only when the disseminator "knows or acts with reckless disregard" as to falsity, consistent with the First Amendment's actual-malice standard. *Id.*, subd. 2(a).

The proscribed deepfakes also work multiple legally cognizable harms. A knowingly false statement intended to harm a candidate is defamation. The First Amendment does not protect knowing and reckless defamatory falsehoods because of the harms they inflict on an individual's dignity and reputation. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-43 (1974).

Even when deepfakes are more generally intended to influence an election, they harm voter rights. Free and fair elections are a cornerstone of democracy. The

39

right to cast votes is a fundamental right that protects all other rights. *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). Intentionally providing voters with false or misleading information injures that right. *See Soltysik v. Padilla*, 910 F.3d 438, 445-46 (9th Cir. 2018). Indeed, in the context of shareholder voting, this Court has recognized that providing false or misleading information to voters is actionable because such statements interfere with "the free exercise of voting rights." *Carpenters' Pension Fund of Ill. v. Neidorff*, 30 F.4th 777, 786 (8th Cir. 2022) (quoting *SEC v. Das*, 723 F.3d 943, 953 (8th Cir. 2013)).

Minnesota's law reaches only deepfakes intended to cause those harms. The deepfake must be made with actual malice and either be intended to injure a candidate or more generally influence an election. In either circumstance, the deepfake works a legally cognizable harm. It is therefore entitled to no First Amendment protection.

### ii. Deepfakes are false speech made to accomplish a fraud.

The government may also prohibit false speech made to accomplish fraud. *United States v. Alvarez*, 567 U.S. 709, 717-18 (2012) (plurality opinion). Such prohibitions are permissible even without a financial or property loss. *Id*. at 721. Rather, intent to defraud is satisfied if the false statement is made "to cause the deceived person to follow some course he would not have pursued but for the deceitful conduct." *United States v. Lepowitch*, 318 U.S. 702, 704 (1943).

Appellate Case: 25-1300    Page: 53    Date Filed: 05/19/2025 Entry ID: 5517985

The deepfake statute also targets speech that falls into this unprotected category. The proscribed deepfakes are false statements, made with actual malice, and intended to change votes "but for the deceitful conduct," either by specifically injuring a candidate or more generally by influencing the election. Minn. Stat. § 609.771, subd. 2(a)(2). Minnesota may thus prohibit them consistent with the First Amendment.

### 3. Even if the law reaches some speech protected by the First Amendment, it is still constitutional.

Even if the Court concludes that the deepfake statute reaches some speech entitled to First Amendment protection, the district court did not abuse its discretion when it denied the preliminary injunction because the law is still likely constitutional. Minnesota's deepfake law should only be subject to intermediate scrutiny. But even under strict scrutiny, the law is narrowly tailored to serve compelling government interests.

### i. Intermediate scrutiny should apply to the deepfake law.

Because the deepfake law reaches false speech where specific harms to free and fair elections are likely to occur, intermediate scrutiny should apply to any applications of the statute that reach constitutionally protected speech.

*Alvarez* is the Supreme Court's leading case on First Amendment protection of false statements. The *Alvarez* majority could not agree whether constitutionally

41

protected false statements were subject to strict scrutiny or intermediate scrutiny. *Compare Alvarez*, 567 U.S. at 724 (plurality opinion) (applying "exacting" scrutiny), *with id.* at 730-31 (Breyer, J., concurring) (applying intermediate scrutiny). Justice Breyer identified a wide range of federal statutes prohibiting false speech— including statutes regulating fraud, perjury, and impersonation of government officials—and observed that those statutes contained limitations that narrowed them "to a subset of lies where specific harm is more likely to occur." *Id.* at 736. Justice Breyer concluded that intermediate scrutiny should apply to government regulations of these types of false speech. *Id.* at 731-32.

After *Alvarez*, this Court has likewise recognized the diminished value of false factual statements, even in the electoral context. *Nord v. Walsh Cnty.*, 757 F.3d 734, 742-43 (8th Cir. 2014) (recognizing that untrue campaign statements "may be deserving of less protection."). And based on the *Alvarez* concurrence, district courts in other circuits have applied intermediate scrutiny to falsehoods intended to impact how people vote. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 120-21 (S.D.N.Y. 2023) (applying intermediate scrutiny to robocalls conveying false information to discourage people from voting by mail); *United States v. Mackey*, 652 F. Supp. 3d 309, 344-45 (E.D.N.Y. 2023) (applying intermediate scrutiny to tweets claiming voters could vote via text message).

42

Appellants do not engage with the differing views expressed in the *Alverez* opinions. Instead, they latch on to this Court's decision in *281 Care Committee II* to argue that strict scrutiny applies. Br. 38-39. But *281 Care Committee II* applied strict scrutiny because the challenged statute "target[ed] falsity, as opposed to the legally cognizable harms associated with a false statement." 766 F.3d at 783. Here, by contrast, the challenged law targets the legally cognizable harms associated with deepfakes—injuring candidates or influencing voter behavior, both of which undermine the state's compelling interest in electoral integrity. So intermediate scrutiny should apply.

> ii. **Even if strict scrutiny applies, the electoral deepfake statute passes it.**

But even if strict scrutiny applies, the deepfake law should satisfy the standard. A law passes strict scrutiny if it is narrowly tailored to serve a compelling interest. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). Minnesota has a compelling and substantial interest in electoral integrity. Indeed, the Supreme Court has recognized that states' interests in "ensuring that an individual's right to vote is not undermined by fraud in the election process" are compelling. *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion). Preventing electoral deepfakes serves this compelling interest.

The deepfake law is also narrowly tailored to further these interests. A statute that affects constitutionally protected speech is narrowly tailored to serve the state's

43

compelling interest if (1) the statute actually advances the state's interest, (2) the statute does not sweep too broadly, (3) the statute does not leave significant influences bearing on the interest unregulated, and (4) no other statute could advance the interest as well and infringe less speech. *Doe v. Bell*, 969 F.3d 883, 892 (8th Cir. 2020). The deepfake law meets these requirements.

**The Law is Necessary.** The deepfake law advances the state's interest in electoral integrity. A statute meets this requirement if it is "actually necessary." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Deepfakes—unlike written lies—are visually and auditorily engaging, making them perfect fodder for false, attention-grabbing content. App. 99; R. Doc. 24, at 10. Moreover, the ease with which deepfakes can be created has led to a surge in creating and disseminating deepfakes, allowing them to be used to present convincing misinformation at scale. App. 94-95; R. Doc. 24, at 5-6. Deepfakes have been used across the globe to influence elections since their barrier to entry has lowered. App. 94-95, 100-01; R. Doc. 24, at 5-6, 11-12. Indeed, deepfakes may have played a role in the outcomes of elections in Slovakia and Taiwan last year. App. 100-01; R. Doc. 24, at 11-12. The record further demonstrates that deepfakes were used to influence the 2024 election. App. 97, 100-01; R. Doc. 24, at 8, 11-12. Existing tools for combatting that influence are inadequate. App. 102-04; R. Doc. 24, at 13-15. There is thus a real need to keep the deepfake law.

Despite the urgent and widely recognized need to act on deepfakes, Kohls and Franson propose two ways in which Minnesota could supposedly achieve its interest without the law: counterspeech and existing causes of action. Br. 42-43. Neither protects Minnesota's interest as well as the deepfake law.

As to counterspeech, Kohls and Franson provided no evidence supporting their assertion that counterspeech is a sufficient response to deepfakes. And the record evidence demonstrates that it is not. For counterspeech to be effective, it must first reach deepfake viewers. But deepfakes primarily spread on social-media websites. App. 97; R. Doc. 24, at 8. Those websites determine whether posts are seen by users based on algorithms that favor content more likely to result in user engagement. App. 103; R. Doc. 24, at 14. Deepfakes are generally designed to go viral, and algorithms significantly favor displaying deepfakes over the counterspeech responding to them. App. 99, 103; R. Doc. 24, at 10, 14.

Counterspeech is especially ineffective because the low-cost and high speed of AI-generated content enables malicious actors to overwhelm information ecosystems with misinformation. App. 98-99, 102; R. Doc. 24, at 9, 13. Thus, in almost all cases, it will be impossible to engage in counterspeech that will adequately, or even meaningfully, respond to a deepfake. *Cf. Davis v. FEC*, 554 U.S. 724, 753-54 (2008) (Stevens, J., concurring in part and dissenting in part) ("[F]ar from contravening the First Amendment, [the law] actually advances its core

45

principles. If only one candidate can make himself heard, the voter's ability to make an informed choice is impaired."). Counterspeech is thus not sufficient to protect Minnesota's interest in combatting deepfakes that are designed to harm the electoral process.

As to the existing causes of action, none are sufficient to protect Minnesota's interest. Br. 43. Private rights of action require private parties to choose to incur the significant costs of litigation to vindicate legal rights. But protecting the public's compelling interest in electoral integrity cannot only be at the mercy of private actors. Nor do private actions protect the state's election-integrity interests, both because of the pace of the tort-like actions Kohls and Franson highlight, and because those actions lack the deepfake law's remedial scope. *See* Minn. Stat. § 609.771, subd. 4.

Kohls and Franson offered no evidence to rebut the need for the statute—just their own speculation and second-guessing of legislative judgment. They principally point to the lack of Minnesota-specific election-influencing deepfakes when the legislature enacted the law. Br. 40. But deepfakes *have* influenced elections—here and abroad. App. 99-101; R. Doc. 24, at 10-12. Minnesota (and the dozens of states who have enacted similar laws) should not be faulted for addressing the threat before it manifests. *Cf. Ramirez v. Collier*, 595 U.S. 411, 444 n.2 (2022) (Kavanaugh, J.,

concurring) ("[A] government need not wait for the flood before building the levee.").

**The Law Does Not Sweep Too Broadly.** The law covers only deepfakes intended to cause specific harms that implicate Minnesota's interest: injuring a specific candidate or influencing an election through deception. The intent requirement narrowly targets these harms. Minn. Stat. § 609.771, subd. 2(a)(2). And the actual-malice requirement ensures that someone who disseminates a deepfake they believe to be real does *not* violate the statute. *Id.*, subd. 2(a).

Still, Kohls and Franson insist that the statute overreaches, principally repeating their argument that the statute covers parodies. Br. 41. Not so. As discussed above, the statute only reaches portrayals where a reasonable person would believe the depicted individual engaged in the depicted conduct—not parodies. *See supra* Arg. Sec. I.A.1.

Citing *281 Care Committee II*, Appellants also contend that the deepfake law somehow "perpetuates the very fraud" it prohibits because it provides a private right of action. Br. 41 (internal quotation marks omitted). But the deepfake law differs in key respects from the disputed law in *281 Care Committee II*. That law allowed *anyone* to file an administrative complaint with an executive-branch agency. 766 F.3d at 778; *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 269 n.4 (Minn. 2001) (explaining that administrative-hearing office is

47

executive-branch agency). But here, only a limited class of plaintiffs—elected officials and those directly harmed by the deepfake's dissemination—can pursue civil relief. *See* Minn. Stat. § 609.771, subd. 4. And unlike the statute in *281 Care Committee II*, the forum for deepfake complaints is district court, not an executive-branch agency. Deepfake complaints are subject to Rule 11 and other judicial tools to sanction parties for frivolous complaints. *Cf.* Minn. Stat. § 554.16 (authorizing attorney's fees as anti-SLAPP tool to discourage frivolous litigation); *Leindecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 228 (Minn. 2014) (noting anti-SLAPP statutes curb civil lawsuits that discourage expression). So the electoral-machination concerns that doomed the statute in *281 Care Committee II* are not present here.

**Significant Interests Are Not Left Unregulated.** The deepfake law also does not leave significant influences bearing on the state's interest unregulated. Appellants make no suggestion that this prong is not satisfied. Br. 38-46. And regardless, Minnesota's law wholly addresses the harms that motivate it. It reaches all false, nonconsensual, knowingly made deepfakes that are intended to cause specific harms. And while deepfakes in general are concerning, the legislature remained mindful of First Amendment free-speech rights by retaining the actual-malice requirement and the narrow timeframe. *Hearing on S.F. 3550 Before the S. Elections Comm.*, 2023 Leg., 93th Sess., at 11:22-14:40 (Minn. Feb. 15, 2024)

Appellate Case: 25-1300     Page: 61     Date Filed: 05/19/2025 Entry ID: 5517985

(statements of Sens. Mark Koran & Erin Maye Quade);[16] *Hearing on H.F. 1370 Before the H. Elections, Fin., & Pol'y Comm.*, 2023 Leg., 93th Sess., at 13:30-14:15 (Minn. Feb. 15, 2023) (statement of Rep. Zach Stephenson);[17] *see also Dun & Bradstreet*, 472 U.S. at 755 (emphasizing significance of actual-malice standard).

**No Less-Infringing Regulation Is Possible.** Nor could any other regulation replace the deepfake law. True, *281 Care Committee II* said that counterspeech is an alternative remedy for the state's interest in preventing electoral disinformation. *281 Care Comm. II*, 766 F.3d at 793-94. But there the Court had no reason to presume that counterspeech would be insufficient. *Id.* The record here shows that traditional ways of combatting false speech (e.g., fact-checking) are insufficient to combat the unique harms that deepfakes inflict on free and fair elections. App. 97-104; R. Doc. 24, at 8-15. The deepfake law even accounts for the limits of counterspeech: it applies only 90 days before nominating conventions and while voting is occurring. Minn. Stat. § 609.771, subd. 2(a)(3). In other words, the law applies when counterspeech will be least ineffective, and when it is unlikely to prevent the election-integrity harms.

---

[16] A recording of this Minnesota Senate hearing is available here: https://www.lrl.mn.gov/media/file?mtgid=1049230. App. 65; R. Doc. 20, at 7.

[17] A recording of this Minnesota House hearing is available here: https://www.lrl.mn.gov/media/file?mtgid=1047353. App. 63; R. Doc. 20, at 5.

### 4. The deepfake law does not discriminate based on viewpoint.

Kohls and Franson briefly argue that the deepfake law sanctions viewpoint discrimination that is "per se" unconstitutional. Br. 44-45. In doing so, Appellants expand the viewpoint-discrimination doctrine far beyond the doctrinal boundaries established by the Supreme Court. Viewpoint discrimination occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). But the deepfake law does not favor any one ideology or opinion. The law generally prohibits deepfakes—irrespective of the message conveyed.

Appellants contrary arguments are unmoored from the statute's text. They claim that the law "privileges speech intended to ossify existing voting patterns over speech intended to alter voting patterns" and "prohibits negative political commentary . . . while allowing positive or laudatory commentary." Br. 44-45. But the law prohibits deepfakes intended to influence an election, regardless of whether they influence voters to change who they are voting for or to solidify voter support. Indeed, whether a deepfake is viewed as negative or positive will inevitably vary: a deepfake of a candidate promising to cut the corporate tax rate to zero will be viewed as a blessing by some and disaster by others. The deepfake law is concerned only about the objectively misleading and nonconsensual nature of the deepfake. The law

50

is not concerned with the deepfake promotes or disparages any ideology, opinion, or perspective. The law is thus not viewpoint discriminatory.

A recent case from this Court drives the point home. *Animal Legal Fund v. Reynolds* involved a First Amendment challenge to an Iowa law that prohibited false speech to gain access or employment with agricultural facilities. 89 F.4th 1065, 1068 (8th Cir. 2024). This Court rejected animal rights organizations' argument that the law amounted to viewpoint discrimination by criminalizing only false speech intended to harm facilities. *Id.* at 1069-70. The Court held that the statute did not distinguish speakers based on viewpoints and simply criminalized using "deception to gain employment with intent to harm a facility." *Id.* at 1070. The intent requirement was viewpoint neutral: "the offender would be liable for deceptively praising the facility ('I love the work you do, and I want to support it!') or deceptively criticizing the facility ('This facility is poorly managed, and I will help increase profits.')." *Id*. Because the law did "not prefer laudatory lies over critical falsehoods," it did not constitute viewpoint discrimination. *Id.*

So too here. The electoral deepfake statute is indifferent to whether the deepfake is ossifying, change-inducing, laudatory, or derogatory. What matters is the knowing or reckless dissemination of a deepfake with intent to intent to injure a candidate or influence an election. So the law does not discriminate based on viewpoint.

51

* * *

The Court should not reach the likelihood-of-success factor because the district court did not evaluate it. But if the Court departs from its common practice of remand, Appellants are unlikely to succeed, and the district court did not abuse its discretion by refusing to enter a preliminary injunction.

## CONCLUSION

The Court should affirm the denial of injunctive relief. Alternatively, if the Court questions the scope of the statute and whether it applies to the parodies, it should certify that question to the Minnesota Supreme Court.

[*Signature on the following page*]

Dated: May 19, 2025               Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**/s/ Pete Farrell**
LIZ KRAMER (#0325089)
Solicitor General
PETER J. FARRELL (#0393071)
Deputy Solicitor General
ANGELA BEHRENS (#0351076)
ALLEN COOK BARR (#0399094)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
angela.behrens@ag.state.mn.us
allen.barr@ag.state.mn.us

and

STATES    UNITED    DEMOCRACY
CENTER

Judy M. Shih (CA Bar No. 206394)
Max Jordan Kober (NY Bar No. 5911409)
1101 17th St NW, Suite 250
Washington, DC 20036
judy@statesunited.org
max@statesunited.org
Phone: (202) 999-9305

*Attorneys for Appellee Ellison*

53

## CERTIFICATES OF COMPLIANCE
## WITH FED. R. APP. P. 32 AND 8th Cir. R. 28A(h)(2)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,354 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

3. Pursuant to 8th Cir. R. 28A(h)(2), the brief has been scanned for viruses, and the brief is virus-free.

/s/ **Pete Farrell**
PETER J. FARRELL
Deputy Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2025, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

<u>/s/ **Pete Farrell**</u>
PETER J. FARRELL